**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 07a0533n.06
Filed: July 27, 2007

**No. 06-3644**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| Pauletta HOUSTON, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| UNUM LIFE INSURANCE CO. OF | ) | NORTHERN DISTRICT OF OHIO |
| AMERICA, | ) | |
| | ) | |
| Defendant-Appellee. | ) | |
| | ) | |

Before: DAUGHTREY and ROGERS, Circuit Judges; OBERDORFER, District Judge.[*]

OBERDORFER, *District Judge*:

In this ERISA action, Plaintiff-Appellant appeals a district court order upholding

Defendant-Appellee's termination of her long-term disability benefits. For the reasons here

stated, we REVERSE the district court judgment and order, and REMAND for further

proceedings consistent with this opinion.

**I.      BACKGROUND**

**A.  The Diagnosis and Initial Disability Determinations**

---

[*] The Honorable Louis F. Oberdorfer, United States District Court for the District of
Columbia, sitting by designation.

The administrative record reveals the following facts. Pauletta Houston worked for Ritz-Carlton Hotels for approximately 22 years. She was last employed there on April 18, 2002, when she was 57 years old. Her most recent title was "housekeeping office coordinator." In that position, she coordinated the schedules and assignments of the housekeeping staff, maintained and set-up housekeeping supplies, and assisted with housekeeping duties as needed, including filling in for absent staff. [JA 753-55]. As Houston later explained, these duties required pushing housekeeping carts and lifting heavy laundry bags. [JA 277].

Ritz Carlton provided Houston with a group long-term disability insurance plan (the "Plan") administered by Unum Life Insurance Company of America ("Unum"). The Plan was, and is, governed by ERISA. It vests Unum with "discretionary authority to determine . . . eligibility for benefits and to interpret the terms and provisions" of the Plan. [JA 817]. An employee is eligible for long-term disability benefits under the Plan when Unum determines that she is "**limited** from performing the **material and substantial** duties of [her] **regular occupation** due to [her] **sickness or injury**." [JA 813, bolding in original]. The Plan defines "regular occupation" as the occupation the employee is routinely performing at the onset of disability. [JA 794]. In determining an employee's regular occupation, "Unum will look at [the] occupation as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location." [JA 794]. A claimant who has received disability payments for 24 months may continue receiving payments only if she is unable to work in any "gainful occupation", i.e. "an occupation that is or can be expected to provide . . . an income at least equal to [her] gross disability payment within 12 months of [her] return to work." [JA 796]. If a claimant is less than 60 years old at the time of the disability, he

or she is only eligible for benefits until age 65. [JA 807]. The Plan also offers assistance to employers with workplace modification and voluntary vocational rehabilitation services (the "return-to-work" program). [JA 802].

In April 2002, Drs. Nicholson and Price diagnosed Houston as having breast cancer. [JA 444-45]. On May 11, 2002, Dr. Nicholson performed a lumpectomy, including an axillary lymph node dissection. [JA 441-42]. For several months, Dr. Price administered chemotherapy to Houston. [JA 526]. Once the chemotherapy was complete, Dr. Blair administered radiation. [JA 446-47]. Meanwhile, Dr. Price restricted her from "heavy lifting, climbing, stooping, pushing, pulling." [JA 873].

In July 2002, after her lumpectomy with axillary lymph node dissection was complete, Houston applied to Unum for benefits under the Plan. Unum approved short-term disability payments. At the same time, Unum initiated a review of Houston's eligibility for long-term disability benefits. In a discussion with a claims representative on September 11, 2002, Houston explained that her chemotherapy treatments would not end until sometime in November 2002, and she was uncertain if radiation would be required thereafter. She informed them that she was experiencing some allergies in response to the chemotherapy, and that she had joint pain. She could shower by herself, but needed help from her family for basic household tasks. [JA 946]. Noting these side effects of her breast cancer treatments, Dr. Price's restrictions, and Houston's reported physical limitations, Unum approved her claim for long-term disability benefits on September 27, 2002, retroactive to July 18, 2002. [JA 941-43]. The approval letter requested that Houston "provide periodic medical evidence and vocational information to support [her] claim for continued disability benefits." [JA 942]. Unum paid Houston $1,002.56 per month.

-3-

[JA 943].

In May 2003, Unum conducted its first complete post-treatment review of Houston's status. Houston had completed chemotherapy and radiation treatment in January 2003. In April, Houston explained to Unum that she was unable to use her right arm fully. [JA 909]. She also submitted her then current medical records, including Dr. Nicholson's notes of a February 26, 2003 visit [JA 502]; Dr. Blair's notes of a March 13, 2003 office visit [JA 521]; and notes from Dr. Harris, her general practitioner, of February 10, 2003 and May 5, 2003 office visits. [JA 769, 422]. Dr. Nicholson and Dr. Harris noted pain and some swelling, while Dr. Blair noted no significant side effects. On or about May 14, 2003, Karen Mills, a nurse on Unum's staff, reviewed these records. Aware that Houston had undergone an axillary lymph node dissection and radiation treatment for her breast cancer, Mills considered each doctor's observations; concluded that *in toto*, the record established that Houston was suffering from edema;[1] and recommended extending Houston's benefits until at least October 2003. [JA 908]. An Unum "roundtable" reviewed the same records and approved Mills' conclusion and recommendation. [JA 840].

### B.   The Termination of Benefits - January 29, 2004

On October 17, 2003, Unum initiated a further review of Houston's claim to "monitor for improvement with right arm swelling." [JA 841]. During this time, Houston remained under the regular care of Drs. Harris and Nicholson. During visits to them, she complained of varying

---

[1] The type of edema associated with breast cancer is lymphedema, a "chronic, debilitating" swelling in the arm that can occur "after lymph vessels or lymph nodes in the axilla (armpit) . . . are removed by surgery or damaged by radiation." WEBSTER'S NEW WORLD MEDICAL DICTIONARY (electronic edition), MedicineNet.com (eds.), *available at* http://www.medterms.com/script/main/art.asp?articlekey=4219.

degrees of pain, swelling, and numbness in her right arm and shoulder. As the district court noted, Dr. Harris observed some swelling on each of her visits, and Dr. Nicholson prescribed medication for her pain, which she took every four hours. [JA 424-25, 570-71, 431, 595]. An x-ray report of October 20, 2003 noted axillary clips from her lumpectomy, but found no signs of fracture, joint space narrowing, or calcifications that could be causing her pain, numbness, and swelling. [JA 418]. Between October 27, 2003 and December 30, 2003, Houston spoke with Unum representatives on at least three occasions. She explained to them that she had trouble lifting. For example, she told them that she relied on her family to take her shopping, could not lift soap powder to do laundry, and explained that a gallon of milk would be too heavy for her. [JA 585, 595, 693].

During this review period, Unum classified Houston's occupation as administrative and thus "sedentary." [JA 912]. In December 2003, Unum staff nurse Elaine Fermanis reviewed the updated file. Without explanation, and contrary to Unum's initial determination based on Mills' recommendation, Fermanis concluded that the record showed that Houston's doctors had *not* observed edema in her extremities. [JA 561]. She determined that the medical evidence did not show a condition that would prevent her from "resum[ing] her former functional capacity." [JA 560]. Fermanis prepared a summary of the records reflecting her own conclusion. The summary conspicuously omitted any reference to Unum's previous favorable conclusion based on Mills' review. [JA 560-61]. Fermanis forwarded her summary to Dr. Lawrence Broda, a doctor employed by Unum, for review. He agreed with her conclusion. [JA 559].

An Unum letter of January 29, 2004 terminated Houston's benefits for the reasons stated by Fermanis and Broda. [JA 550]. The letter stated that Unum had classified her regular

occupation as sedentary. The letter also notified her of her right to appeal and to submit additional medical and vocational information, including, specifically, updated activity restrictions prescribed by her doctors.

## C. Houston's Appeal

Houston appealed this determination, responding directly to the reasons Unum gave her. She submitted a form completed by Dr. Nicholson about her physical capacity, which generally restricted her to lifting no more than 5 pounds at a time. He attributed the restrictions to the consequences of the "axilly dissection with breast biopsy." [JA 433-34]. A similar restriction form, apparently completed by Dr. Price in late 2003 or early 2004, limited Houston to lifting 2 pounds with her right arm and 10 pounds with her left. [JA 524]. She submitted additional handwritten notes by Dr. Harris from appointments with Houston in January and April 2004; they appear to state that he continued to observe some edema and tenderness in her arm. [JA 426, 428].[2] She also provided documentary verification of her treatment with a prescription painkiller. [JA 431].

On June 26, 2004, Houston visited Mark Anderson, not an M.D., but a Licensed Professional Counselor (L.P.D.) and Certified Disability Management Specialist (C.D.M.S). He conducted a detailed vocational assessment that included several tests and a physical examination. Anderson observed that Houston was unable to complete a pegboard test for manual dexterity due to pain and inability to reach with her right arm. [JA 154]. In his report, Anderson noted a number of limitations, including:

---

[2] We agree with the district court's comment that Dr. Harris' notes are extremely difficult to read. We do not purport to make a factual finding as to their conclusive medical import; our holding is based on the other restrictions and observations in the record.

"constant pain in the right arm along with swelling and numbness. She is right handed and is only able to write for approximately 2-3 minutes at a time. She is limited to lifting less than 5 lbs., is unable to reach forward or pull with her right extremity and has difficulty sitting, standing or walking for prolonged periods of time."

[JA 153]. After he reviewed the limitations prescribed by Houston's doctors, and making his own observations, Anderson concluded that "Houston is physically capable of less than the full range of sedentary work." [JA 152]. Of particular import, Anderson also concluded that she required "assistance with activities of daily living including laundry, cleaning and shopping." [JA 152].

In addition, Anderson formally reviewed Houston's regular occupation of Housekeeping Office Coordinator and classified it as "cleaner/housekeeping" and "laundry worker II." The Department of Labor defines this position as unskilled, requiring light to medium strength. [JA 154]. Finally, Houston submitted her own affidavit that her occupation was not in fact sedentary, and that she could not meet its more demanding physical requirements, which included "a good deal of walking, pushing carts, bending and lifting laundry bags that could weigh up to twenty (20) pounds each." [JA 277].

In August 2004, Unum occupational reviewers "clarif[ied]" [JA 179] Houston's occupation: not as sedentary, but, as performed in the national economy, as requiring "[l]ifting, [c]arrying, [p]ushing, and [p]ulling 20 [l]bs. occasionally, frequently up to 10 [l]bs. or negligible amount constantly." [JA 178]. Unum then submitted to Fermanis and Dr. Broda the restrictions prescribed by Houston's physicians and updated medical records.

On August 16, 2004, despite the foregoing information, Fermanis erroneously recorded "Restrictions/Limitations: none currently provided." [JA 184]. Fermanis opined that Houston

manifested no edema and concluded that "[t]here is no evidence in the new medical information of a significant condition that changes the prior medical opinion." [JA 184].[3] On August 17, 2004, Dr. Broda reviewed and agreed with Fermanis' conclusions. [JA 182].

On September 10, 2004, Unum wrote Houston that it would not reconsider its January 29, 2004 decision to terminate her benefits. The September letter did not address Dr. Anderson's conclusions; rather, Unum only noted that the vocational analysis "reflected a first grade reading level and a third grade or less math level" and that the dexterity test was "incomplete." [JA 168]. Unum further justified the termination because: (1) "only your primary care physician reports shoulder pain and . . . exams are limited without apparent edema of the arm . . ." and (2) the vocational assessment, "considered alone" was "inconclusive because there is no global assessment of cognitive, psychological/psychiatric and physical function that would provide context for these low scores." *Id.* Finally, Unum explained that it would forward Houston's file to its Quality Performance Support Unit for a final, "impartial" review on appeal. *Id.*

**D.      The Final Denial - October 15, 2004**

In September 2004, Unum's Quality Performance Support Unit forwarded a summary of Houston's claim file and the medical records to Dr. Allan Lipton, an oncology surgeon at Pennsylvania State University. He noted the restrictions in the record, but concluded, in pertinent part, that: (1) the restrictions and limitations provided by Houston's physicians "were not supported by appropriate medical workup"; (2) "the patient should have been referred to an orthopedic surgeon who specializes in shoulder problems as well as a neurologist to perform a workup of her symptoms. In the absence of a more extensive workup it is not possible to say that

---

[3]  It is unclear if Fermanis considered the change in job classification during her review.

-8-

the patient was indeed disabled and not able to perform her usual work duties"; and (3) "the patient's complaints of right arm and shoulder pain and disability are not consistent with her documented medical findings." [JA 140].

On October 15, 2004, Unum issued a final denial letter. This letter told her for the first time that she needed to see an orthopedic surgeon or neurologist in order to evaluate properly and to diagnose the symptoms she reported. [JA 131]. That letter offered Houston no opportunity to react or respond to this new requirement.

## II. PROCEDURAL BACKGROUND

On January 11, 2005, Houston filed a complaint in the Northern District of Ohio challenging Unum's determination, alleging violations of ERISA and breach of fiduciary duty. She sought reinstatement of benefits and attorneys' fees. On September 15, 2005, the parties filed cross-motions for judgment on the administrative record. Unum contended, as summarized in a proposed findings of fact and conclusions of law filed on October 14, 2005, that its actions were not arbitrary and capricious, but based on substantial evidence of Houston's failure to support her claim by appropriate medical evidence. [JA 72-73].

In a brief filed October 18, 2005, Houston countered that there was "undisputed medical evidence . . . that Mrs. Houston cannot perform a full range of sedentary positions" and that "*no* evidence in the record demonstrates that Mrs. Houston is capable of performing her old position, or any other occupation." [JA 80, emphasis in original]. In addition, she contended that Unum "focused on information that Mrs. Houston was not given an opportunity to rebut." [JA 81]. She also emphasized what she claimed was Unum's arbitrary and capricious shift of its rationale for the termination of her benefits: "[w]hen they were no longer able to substantiate their first

reason for denial," she alleges that Unum "simply changed its rationale . . ., leaving Mrs. Houston with no opportunity to respond to their new report of a non-treating, non-examining physician [Dr. Lipton]." [JA 76].

On March 9, 2006, the district court granted judgment on the administrative record to Unum. The district court accepted Unum's argument that its termination was based on sufficient substantial evidence. The district court reasoned that, while Houston's "doctors observed some swelling . . . by January 2004, Unum saw insufficient facts demonstrating that the plaintiff suffered from debilitating physical symptoms beyond the self-reported ones" and that the "situation had not substantially changed" by October 2004 when Unum denied her appeal. [JA 115]. It held that Unum's reasoning was consistent and that its determination had a rational basis. However, the district court conspicuously failed to address Houston's challenge to Unum's failure to afford her an opportunity to respond to Unum's late-blooming rationale for termination of her benefits: failure to consult a neurologist or orthopedist.

On April 7, 2006, Houston timely filed this appeal. She argues that Unum's shifting rationale for terminating her benefits failed to comply with 29 U.S.C. § 1133 and that its decision was arbitrary and capricious.[4] We find that Unum's shifting rationale violated 29 U.S.C. § 1133, and conclude, for additional reasons, that Unum's ultimate termination of Houston's benefits was arbitrary and capricious.

III.    STANDARD OF REVIEW

Section 1133 of ERISA provides:

---

[4] Houston's filings before the district court did not specifically invoke 29 U.S.C. § 1133, but plainly raised the substance of such a violation.

In accordance with regulations of the Secretary, every employee benefits plan shall–

> (1)  provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, *setting forth the specific reasons for such denial*, written in a manner calculated to be understood by the participant, and

> (2)  afford a reasonable opportunity to any participant whose claim for benefits has been denied *for a full and fair review* by the appropriate named fiduciary *of the decision denying the claim*.

29 U.S.C. § 1133 (2007) (emphasis added) ("§ 1133"). The implementing regulations require that an ERISA administrator provide a claimant with written notice of any adverse benefit determination, including "[t]he specific reason or reasons for the adverse determination" and "[a] description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary." 29 C.F.R. § 2560.503-1(g) (2007). We review *de novo* the legal question of whether the procedure employed by a plan administrator in terminating benefits meets the requirements of § 1133. *McCartha v. National City Corp.*, 419 F.3d 437, 444 (6th Cir. 2005) (citing *Kent v. United Omaha Life Ins. Co.*, 96 F.3d 803, 806 (6th Cir. 1996)).

We also review *de novo* the district court's decision granting judgment on the administrative record in an ERISA disability action. *Glenn v. MetLife*, 461 F.3d 660, 665 (6th Cir. 2006) (citing *Whitaker v. Hartford Life & Accident Ins. Co.*, 404 F.3d 947, 949 (6th Cir. 2005)). Where, as here, an insurance plan administrator is vested with discretion to interpret the plan, we review the decision to terminate benefits under the arbitrary and capricious standard. *See Evans v. UnumProvident Corp.*, 434 F.3d 866, 875 (6th Cir. 2006) (citations omitted). If the

administrative record evidences a "reasoned explanation" for an administrator's decision, the decision is not arbitrary or capricious. *Williams v. Int'l Paper Co.*, 227 F.3d 706, 712 (6th Cir. 2000). However, "merely because our review must be deferential does not mean our review must also be inconsequential. . . . [F]ederal courts do not sit in review of the administrator's decisions only for the purpose of rubber stamping those decisions." *Moon v. Unum Provident Corp.*, 405 F.3d 373, 379 (6th Cir. 2005).

ERISA requires insurance companies to act as fiduciaries: plan administrators "shall discharge [their] duties with respect to a plan solely in the interest of the participants and beneficiaries and [] for the exclusive purpose of [] providing benefits to participants and their beneficiaries . . . in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter . . ." 29 U.S.C. § 1104(a)(1) (2007). The process is not intended to be adversarial. In addition, "[c]ourts should be particularly vigilant in situations where, as here, the plan sponsor bears all or most of the risk of paying claims." *University Hosps. of Cleveland v. Emerson Elec. Co.*, 202 F.3d 839, 846 n.4 (6th Cir. 2000).

## IV. ANALYSIS

### A. Did Unum "Substantially Comply" With § 1133?

The "essential purpose" of § 1133 is twofold: (1) to notify the claimant of the specific reasons for a claim denial, and (2) to provide the claimant an opportunity to have that decision fully and fairly reviewed by the fiduciary. *See Moore v. Lafayette Life Ins. Co.*, 458 F.3d 416, 436 (6th Cir. 2006) (citing *Kent*, 96 F.3d at 807). This court has adopted a "substantial compliance" test in deciding whether denial or termination notices meet the requirements of §

1133. *McCartha,* 419 F.3d at 444 (citing *Marks v. Newcourt Credit Group, Inc.*, 342 F.3d 444, 460 (6th Cir. 2003) and *Kent*, 96 F.3d at 807-08).

Here, Unum argues that its reason for the termination of benefits was consistently "lack of medical evidence." However, the record shows that Unum was applying that generic label to its determination for two very different reasons. Unum initially terminated Houston's benefits because it erroneously concluded that her occupation was sedentary, and that the medical evidence was insufficient to show that she could not perform a sedentary job. In response, Houston provided the additional evidence requested and asked Unum to correct the job classification. Unum failed to acknowledge its initial error in the job classification, and arbitrarily reiterated that the medical evidence did not show that she was disabled from her regular occupation. Most important, Unum's final letter denying her appeal told her, for the first time, that her medical evidence was insufficient *because she did had not seen the proper specialist (i.e. an orthopedist or neurologist) to obtain the correct diagnosis*.

This process did not properly "notify[] [Houston] of [Unum's] reasons for denying [her] claims and afford[] [Houston] a fair opportunity for review." *Marks*, 342 F.3d at 460 (emphasis added, citations omitted). Full and fair review does not mean that an insurance company can simply mouth the same reason: "the persistent core requirements of review intended to be full and fair include knowing what evidence the decision-maker relied upon, *having an opportunity to address the accuracy and reliability of that evidence*, and having the decision-maker consider the evidence presented by both parties prior to reaching and rendering his decision." *Halpin v. W.W. Grainger, Inc.,* 962 F.2d 685, 689 (7th Cir. 1992) (emphasis added, quotation omitted). In violation of § 1133, Unum failed to provide an opportunity for Houston to respond, with

-13-

argument or action, to Unum's revised rationale for terminating her benefits, including Dr.

Lipton's opinion that she be seen by "proper" specialists, and, if indicated, to obtain the type of

care Unum recommended in its final termination letter. *See, e.g., McCartha*, 419 F. 3d at 445-

47.

### B. Was Unum's Decision "Arbitrary and Capricious"?

The foregoing violation of § 1133 is not the only problem with the determination process.

In order to determine whether Unum's ultimate decision was arbitrary and capricious, we also

consider whether Unum's decision "is the result of a deliberate, principled reasoning process and

[whether] it is supported by substantial evidence." *Glenn*, 461 F.3d at 666 (quoting *Baker v.

United Mine Workers of Am. Health & Ret. Funds*, 929 F.2d 1140, 1144 (6th Cir.1991)); *see also

Killian v. Healthsource Provident Adm'rs*, 152 F.3d 514, 520 (6th Cir. 1998). "Accordingly, we

review not only the insurer's conclusion, but also its reasoning." *Metropolitan Life Ins. Co. v.

Conger*, 474 F.3d 258, 265 (6th Cir. 2007). Here, Unum's reasoning suffered from several

critical flaws.

First, Unum's abrupt, inexplicable reversal of its own conclusion that Houston was

suffering from post-breast cancer edema in her arm is *per se* unreasoned and unprincipled. *See

Part I.B., *supra*. The record shows that her treating physicians, as well as a vocational specialist,

observed and documented varying degrees of pain, tenderness, and related physical limitations.

While Dr. Harris's handwritten notes are difficult to read, we agree with the district court that

they at least indicate observation of some swelling.[5] While an observation of edema in and of

---

[5] We note that the district court based its holding in part on a finding that Houston's
disability claim was primarily based on self-reported symptoms. For disabilities based on
"self-reported symptoms," Unum will generally make no more than 12 monthly disability

-14-

itself might not be sufficient to demonstrate disability, it evidences a potentially disabling condition.

Second, Unum's reasoning also suffers independent flaws. The administrative record reveals that Unum did not give full consideration to Houston's objective vocational evidence of disability, particularly the Anderson report. Under the terms of the policy, Houston must prove that she is limited from performing the material duties of her regular occupation "due to injury or sickness." [JA 813]. Vocational evidence may and should be considered in determining her occupational abilities. *Cf. Rochow v. Life Ins. Co. of N. Am.*, 482 F.3d 860, 865-66 (6th Cir. 2007). Without explanation, Unum characterized the pegboard test results as "incomplete" and discounted the analyst's observations of Houston's physical limitations. Instead, it inexplicably focused on the cognitive function findings, claiming that there was no medical support for Houston's low literacy and math test skills. These tests, while perhaps important in a later determination of the realm of gainful occupations available to Houston, are not relevant to the current inquiry on appeal: whether or not she was physically limited from the full use of her arm due to symptoms related to any sickness or injury. Given that there was no conflicting vocational evidence in the record, Unum failed to give Anderson's vocational conclusions and observations proper consideration. *See, e.g., Evans*, 434 F.3d at 879-80; *Rochow*, 482 F.3d at 866.

Finally, there are many reasons to view with skepticism Unum's medical reviewers'

---

payments. [JA 807]. The Plan defines "self-reported symptoms" as symptoms "that are not verifiable using tests, procedures, or clinical examinations," including "headaches, pain, fatigue, stiffness, soreness, ringing in ears, dizziness, numbness, and loss of energy." [JA 793]. However, Unum never invoked the policy's limitation on payments for self-reported symptoms in the termination letters. That provision, even if it were applicable, can not be used retrospectively to justify a termination decision that was the result of a flawed reasoning process.

conclusions. When assessing a non-treating physician's opinion, the court may consider several factors, including: (1) whether the reviewing physician has a conflict of interest, *Moon*, 405 F.3d at 381-82; (2) whether the administrator decided that the physician should conduct a file review rather than a physical exam, particularly when it has the right to require a physical exam[6], *Calvert v. Firstar Fin. Inc.,* 409 F.3d 286, 295 (6th Cir. 2005); and (3) whether the non-treating physician's conclusion makes a "critical credibility determination[] regarding a claimants's medical history and symptomology" without observing the claimant, *id.* at 297. It is well-established that Unum is not required to defer to the opinions of treating physicians, *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 834 (2003); it is equally clear that a plan administrator may not disregard those opinions. *See Evans,* 434 F.3d at 877.

Here, two of Houston's treating physicians imposed restrictions on lifting during the relevant time period, and Dr. Nicholson's form specifically stated that the reason for the ongoing restriction was the axillary node dissection associated with her lumpectomy. Nurse Fermanis and Dr. Broda did not consider these restrictions. [JA 182, 184]. Furthermore, in light of Unum's own initial conclusion that Houston appeared to be suffering from post-breast cancer edema [JA 908, 840], it is not reasonable that Dr. Lipton gave no credence to the cause stated by Dr. Nicholson (the axilly node dissection), or that he failed consider whether the restrictions provided might be prophylactic in nature due to her risk of edema, as noted by Mills. [JA 908]. *See, e.g., Evans*, 434 F.3d at 879 (noting that restrictions and limitations can be preventive, not

---

[6]   The Plan gives Unum the right to require a claimant to be "examined by a physician, other medical practitioner or vocational expert of [its] choice." [JA 813].

merely prohibitive, in order to support a claim of disability).[7]

We also take into consideration the fact that Unum's internal reviewers, whose persuasiveness is diminished by a conflict of interest, drew their conclusions about Houston's symptoms solely on a file review. We also view Unum's ultimate reliance on Dr. Lipton's opinion with some skepticism because it was essentially "a critical credibility determination" about Houston's complaints made without the benefit of a physical exam. *See Calvert,* 409 F.3d at 297.

The issue before us is not whether discrete acts were arbitrary and capricious, but whether the ultimate decision, and the making of it, were arbitrary and capricious. *Spangler v. Lockheed Martin Energy Sys., Inc.,* 313 F.3d 356, 362 (6th Cir. 2002). Here, the record reveals internal inconsistences. Objective vocational evidence (i.e. the Anderson report) was not fully considered. It is not clear that the documented restrictions were reviewed from the perspective of the correct job classification. The reviewers never consulted with Houston's doctors. The reviewing physicians made credibility determinations about her reports of pain without benefit of independent exam. Viewing these flaws in the context of the entire record, we conclude that

---

[7] Courts have observed that lymphedema is a chronic condition that may ebb and flow; it can take months or even years after breast cancer treatment to develop and be diagnosed. *See generally Slayton v. Apfel,* 175 F.3d 1016 (table), 1999 WL 152614 at * 1-*2 (4th Cir. Mar. 22, 1999) (describing lymphedema and its effects). Lifting restrictions may be imposed after breast cancer surgery or radiation to prevent lymphedema. *See, e.g., Janezich v. Barnhart*, 453 F. Supp. 2d 1019, 1023 (N.D.Ill., 2006) (describing lifting restrictions imposed to avoid lymphedema); *see also* WebMD Medical Reference & The Cleveland Clinic, *Breast Cancer: Side Effects of Treatment: Lymphedema, available at* http://www.medicinenet.com/breast_cancer_and_ lymphedema/article.htm (women at risk for lymphedema should "avoid repetitive movements of the affected arm (such as scrubbing, pushing, or pulling)" and should "not carry a purse or bag on your shoulder (the side where you had surgery)").

Unum's final decision to terminate Houston's benefits was arbitrary and capricious: neither "the result of a deliberate principled reasoning process", nor "supported by substantial evidence." *Killian,* 152 F.3d at 520; *see also Smith v. Continental Cas. Co.,* 450 F.3d 253, 264 (6th Cir. 2006); *Elliott v. Metropolitan Life Ins. Co.,* 473 F.3d 613, 619-20 (6th Cir. 2006).

### C.    Remedy

For violations of § 1133, reversal and remand to the district court or to the plan administrator for full and fair review is ordinarily appropriate. *Marks*, 342 F.3d at 461 (citing *VanderKlok v. Provident Life & Accident Ins. Co.*, 956 F.2d 610, 619 (6th Cir.1992)). Where, as here, an insurer's final determination is also arbitrary and capricious, the court has discretion to fashion an appropriate remedy. While this circuit has not adopted a categorical rule, it has noted that, generally a "retroactive award is usually proper when [the] claimant had benefits and lost them," while "remand is appropriate when a decision-maker fails to make adequate findings or fails to provide [] adequate reasoning." *Elliott*, 473 F.3d at 622 (quoting *Buffonge v. Prudential Ins. Co. of America*, 426 F.3d 20, 31 (1st Cir.2005) (internal citation omitted)).

Here, because (1) Unum previously determined that Houston was entitled to continued long-term benefits due to breast cancer-related edema in her right arm, and (2) Houston presented objective evidence of ongoing disability in the form of restrictions prescribed by her doctors and a vocational analysis performed by a licensed counselor, we conclude that Houston remains presumptively entitled to continuation of her previously awarded long-term disability benefits. Thus, reinstatement of Houston's long-term disability payments ($1002.56 per month) is the appropriate remedy in this case. *See, e.g., Evans*, 434 F.3d at 880.

This decision is without prejudice to Unum's reinitiating further review to determine if

Houston remains unable to work under the "gainful occupation" standard. If Unum elects to undertake such a review, it should give adequate consideration to Anderson's vocational analysis, including Houston's limited literacy and mathematical skills that he identified.

## CONCLUSION

Accordingly, the district court's order is REVERSED and REMANDED for further proceedings consistent with this opinion.